UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA     :
    :
        v.     :    CRIM NO. 3:12CR97(EBB)
    :
MICHAEL THOMPSON &     :
TYLON VAUGHN     :

RULING ON MOTIONS FOR JUDGMENT OF ACQUITTAL

On December 6, 2013, a jury found defendants Michael Thompson ("Thompson") and

Tylon Vaughn ("Vaughn") guilty on all counts charged against them in the second superseding

indictment.  Specifically, Thompson was convicted on count one, which charged him with

conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine,

280 grams or more of cocaine base and an indeterminate amount of oxycodone, in violation of 21

U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.  Vaughn was convicted on count one, for conspiracy

with intent to distribute and to distribute 280 grams or more of cocaine base and an indeterminate

amount of marijuana, in violation of 21 U.S.C. § § 841(a)(1), 841(b)(1)(A), 841(b)(1)(D) and

846; count two, for possession with intent to distribute and distribution of cocaine base, in

violation of 21 U.S.C. § § 841(a)(1) and 841(b)(1)(C); and count three, for possession with intent

to distribute and distribution of cocaine base in violation of 21 U.S.C. § § 841(a)(1) and

841(b)(1)(C).

Thompson and Vaughn have now moved for judgments of acquittal on their conspiracy

convictions pursuant to Fed. R. Crim. P. 29(c).[1]  Thompson, joined by Vaughn, has also moved,

---

[1]Vaughn does not challenge his convictions on count two and count three, the drug
distribution charges.

*pro se*, for a new trial pursuant to Fed. R. Crim. P. 33.  In support of their motions, the

defendants argue that the testimony of the government's cooperating witness, Christopher Morley

("Morley"), a co-defendant in this case, was so incredible that it should not have been admitted.

They further challenge the sufficiency of the credible evidence pertaining to the existence of, and

their membership in, the alleged drug conspiracy, as well as the evidence supporting the jury's

drug-quantity attributions.  For the following reasons, the Court finds their claims to be without

merit and, accordingly, denies their motions [docs. #982 & 1005].

*Legal Standard*

The question before the Court on a Rule 29(c) motion for judgment of acquittal is

whether, based on the totality of the evidence viewed in the light most favorable to the

government and drawing all reasonable inferences in the government's favor, a reasonable juror

might fairly have concluded the guilt of each defendant beyond a reasonable doubt.  United

States v. Cote, 544 F.3d 88, 98 (2d Cir. 2008).  Such a motion may be granted only if the Court

finds the evidence that the defendants committed the crimes alleged is nonexistent or so meager

that no reasonable jury could have found them guilty.  United States v. Guadagna, 183 F.3d 122,

130 (2d Cir. 1999).  The court may not substitute its own determination regarding the evidence or

the reasonable inferences drawn from it, for that of the jury, and must give full play to the

exclusive right of the jury to determine credibility.  Id; United States v. Strauss, 999 F.2d 692,

696 (2d Cir. 1993).  Any defendant challenging the sufficiency of the evidence on which his

conviction rests bears a heavy burden.  United States v. Hawkins, 547 F.3d 66, 70 (2d Cir. 2008).

This  strict standard of deference is necessary to avoid judicial usurpation of the jury's function of

determining credibility and guilt.  United States v. Nusraty, 867 F2d 759, 762 (2d Cir. 1989);

2

United States v. Rodriguez, 702 F.2d 38, 41 (2d Cir. 1983).  Where the Court concludes that the jury's finding of guilt beyond a reasonable doubt is "fairly possible," it must let the verdict stand. United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984).

In a similar vein, motions for a new trial pursuant to Rule 33 are not favored and are only granted sparingly and with great caution.  United States v. Lombardozzi, 343 F.2d 127 (2d Cir. 1965).  A district court has discretion to grant a new trial in the interest of justice, *i.e.*, where it has a "real concern that an innocent person may have been convicted."  United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005).  In exercising its discretion, the court "may weigh the evidence and credibility of witnesses," Cote, 544 F.3d at 101, but only where extraordinary circumstances have been demonstrated may the court "intrude upon the jury function of credibility assessment." Id.  Indeed, only in an extraordinarily rare instance where the testimony is patently incredible or defies physical realities, may the court reject the jury's evaluation.  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).  But even if the court were to reject all or part of a witness's testimony, a defendant would not automatically be entitled to a new trial.  The test is whether "it would be a manifest injustice to let the guilty verdict stand." Id.  Although courts have broader discretion to grant relief under Rule 33 than under Rule 29, "courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary of circumstances."  Id.

With regard to both motions, the high degree of deference the Court must afford to a jury verdict is especially important in conspiracy cases.  United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992).  This is so because a conspiracy, by its very nature, is a secret operation that is usually proved by indirect and circumstantial evidence and the permissible inferences that may be drawn from it.  Nusraty, 867 F.2d at 762.

*Elements of a Drug Conspiracy*

To prove a defendant guilty of a drug conspiracy the government must establish that he knew the conspiracy involved controlled substances and that he participated in the conspiracy with the specific intent that controlled substances would be possessed and distributed by him. United States v. Torres, 604 F.3d 58, 66 (2d Cir. 2010). This may be done by introducing evidence from which a jury can reasonably infer that the defendant knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it. United States v. Hassan, 578 F.3d 108, 123 (2d Cir. 2008). A defendant's knowing participation and criminal intent may be inferred from circumstantial evidence such as his association with the other conspirators in furtherance of the conspiracy; his presence at critical stages of the conspiracy that cannot be explained by happenstance; his possession of items that are of significance to the conspiracy; or evidence that he received or expected to receive a share of the profits from the conspiracy. United States v. Aleskerova, 300 F.3d 286, 292-93 (2d Cir. 2002).

Further, the government need only demonstrate the defendant's awareness of the general nature of the alleged conspiracy and that the members of the conspiracy had a tacit understanding to carry out the objects of the conspiracy. Nusraty, 867 F.2d at 763. Involvement and knowledge of the conspiracy may be inferred from evidence that the defendant knew only one other member of the conspiracy and participated in a single act of substantial scope. United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008).

With regard to drug quantity, it is well established that, in a narcotics conspiracy, a defendant may be held accountable not only for the quantity of drugs he, alone, conspired to distribute or possess, but for the entire quantity his co-conspirators conspired to distribute or

4

possess "provided he knew of his co-conspirators' illicit activities or the activities were reasonably foreseeable by him."  United States v. Jackson, 335 F.3d 170, 181 (2d Cir. 2003).

*The Trial Evidence*

The government's evidence at trial consisted of, *inter alia*, the testimony of federal and local law enforcement agents who were members of the DEA New Haven task force ("Task Force") which conducted the extensive, long-term investigation of narcotics trafficking and related criminal activity in New Haven, Connecticut, that the members of the charged conspiracy engaged in from approximately December 2006 to approximately May 2012.  The government's chief witness was Christopher Morley ("Morley"), a cooperator who was a co-defendant in the same drug conspiracy as Thompson, Vaughn and others.  The government also introduced audio recordings of intercepted cell phone conversations that occurred over wiretapped cell phones used by Morley, Vaughn and other co-conspirators; testimony of an undercover officer regarding his controlled purchases of cocaine from Vaughn; testimony of members of the Task Force describing the extensive physical surveillance of the defendants and other members of the conspiracy; as well as physical evidence seized from Vaughn's and Thompson's residences and other locations used by the members of the conspiracy consisting of drug paraphenalia, U.S. currency and cell phones.[2]

More specifically, the government received authorization to intercept communications over numerous cell phones used by members of the conspiracy, in particular, one cell phone

_____

[2]On February 11, 2012, law enforcement officers executed search warrants at three locations used by the members of the conspiracy.  Among the items they recovered during the searches were $50,000 in U.S. currency from Morley's primary residence; a package containing 6,800 grams of marijuana addressed to Martin at Morley's grandmother's house; and a money counter and kilogram wrappers bearing cocaine residue at the conspiracy's "stash house."

primarily used by Vaughn, two cell phones primarily used by co-defendant Britt Martin[3]

("Martin") and two cell phones primarily used by Morley.  The wiretaps commenced on June 29,

2011 and ended on August 27, 2011.  The communications that were intercepted in that time

period, along with physical surveillance of the co-conspirators, revealed that Morley and Martin,

the leaders of the drug gang, obtained large quantities of cocaine from unidentified sources in

New York City for distribution throughout New Haven.  Much of that cocaine was converted to

crack by Martin.[4]  Morley and Martin also obtained large quantities of marijuana and, along with

other co-conspirators, obtained thousands of oxycodone pills for distribution.

Morley testified generally about the infrastructure of the charged conspiracy and

specifically about his partnership with Martin and described in detail the roles played by Vaughn

and Thompson.  Morley's testimony was corroborated by the audio recordings of  intercepted cell

phone conversations between Martin and Vaughn, Morley and Vaughn and Vaughn and other co-

conspirators; physical surveillance and video recordings of controlled purchases of crack cocaine

from Vaughn[5] and a video recording of Vaughn meeting with another conspirator; and the facts

relating to Vaughn's employment of two runners to assist his distribution activities, one of whom

was arrested with 0.84 grams of crack packaged for street distribution.  Basically, according to

---

[3]Defendant Britt Martin pleaded guilty immediately before jury selection commenced in
this case.

[4]During the time frame of the charged conspiracy, from December 2006 to May 2012,
Morley and Martin acquired for distribution 40 kilograms of cocaine and Martin converted at
least 6 kilograms of it to cocaine base.

[5]Members of the Task Force conducted controlled purchases of crack cocaine from
Vaughn on two separate occasions: the first occurred on May 5, 2011 and involved 10.3 grams of
crack.  The second, on June 13, 2011, involved the purchase of 4.0 grams of crack.

Morley's testimony, Vaughn's primary role in the conspiracy was to work for Martin as a street-level distributor of cocaine base and marijuana.

Regarding Vaughn's membership and participation in the conspiracy, Morley testified that he and Martin supplied Vaughn with approximately 100 grams of cocaine base for the purpose of redistribution.  The drugs were supplied to Vaughn on credit in return for Vaughn's pledge of loyalty to Martin and an installment plan for repayment.  Vaughn frequently visited the conspiracy's "stash house."  Vaughn attempted to refer marijuana customers to Martin on numerous occasions.  On one occasion Vaughn provided Martin with one pound of marijuana. He also contacted Morley after Martin was arrested to arrange bond to secure Martin's release. And at one point Vaughn even asked Morley directly for a promotion in the conspiracy. Specifically, he asked Morley if he would "put [him] in a position off this block."

The evidence regarding the quantity of drugs attributable to Vaughn is similarly compelling.  Specifically, Morley testified that Vaughn distributed approximately 3.5 grams of cocaine base every day and that he and Martin supplied Vaughn with approximately 100 grams of cocaine base during the time frame of the charged conspiracy.  Morley further testified that Vaughn knew that Martin sold large quantities of cocaine base.  Thus, from Morley's testimony the jury could reasonably find that Vaughn, through his direct participation in the conspiracy, distributed approximately 100 grams of cocain base.  Further, based on the totality of the evidence, including Vaughn's personal drug distribution activities and the activities of his co-conspirators, including Morley and Martin, it was reasonably foreseeable to Vaughn that the quantity of cocaine base involved in the conspiracy exceeded 280 grams.

With regard to the indeterminate quantity of marijuana attributed to Vaughn, Morley

testified that on December 21, 2011, Vaughn provided Martin with approximately one pound of marijuana which the police recovered from Martin when he was arrested shortly thereafter.[6] Morley's testimony in this regard was corroborated by an intercepted cell phone conversation that occurred after Martin's arrest in which Vaughn tells Morley that "the big dude got knocked" and "they found a pound."  Morley's testimony is further corroborated by testimony describing the physical surveillance of Martin as he left Vaughn's sister's house minutes before he was stopped and arrested for possession of the marijuana he just obtained from Vaughn.  Other  evidence supporting Vaughn's involvement in the marijuana object of the conspiracy includes an intercepted conversation in which Martin clarified with Vaughn that they were "talking about weed" and that Martin would charge referred customers $570 for "two units of marijuana or "$2400 all day" for a particular quantity.

Morley also testified about Thompson's membership and participation in the drug conspiracy led by Martin and Morley.  His testimony in that regard was corroborated by audio recordings of numerous phone conversations he had with Thompson.  Morley stated that he supplied approximately 2 kilograms of cocaine to Thompson from 2010 through 2011 and described how Thompson converted approximately 1 kilogram of that cocaine into cocaine base. In an audio recording of an intercepted call between Thompson and Morley, Thompson tells Morley that of the 500 grams of cocaine which Morley gave him to convert to crack, only "450, 460 came back."  In another audio recording of an intercepted call, Thompson complained to Morley about impurities that degraded the cocaine Morley had given him to convert.  Further,

---

[6]During a subsequent search of Martin's residence, law enforcement officers recovered quantities of marijuana consisting of 446.8 grams, 54.1 grams and 446.6 grams; approximately $18,000; a firearm; and drug packaging material and digital scales.

Morley testified that he supplied Thompson with oxycodone. That testimony was also corroborated by an audio recording of an intercepted cell phone conversation between Morley and Thompson in which Thompson lamented the scarcity of Morley's supply and Thompson's need to satisfy his customers' demand for oxycodone pills. Morley testified he supplied cocaine and oxycodone to Thompson on credit and that Thompson fell behind in repaying him. At the time of his arrest, Thompson owed Morley approximately $64,000. This testimony also is corroborated by several intercepted phone conversations in which Morley seeks repayment from Thompson. Morley further testified that, at his request, Thompson delivered quantities of crack cocaine to another co-conspirator and that testimony was supported by several intercepted phone conversations as well. In addition, according to Morley, on approximately ten occasions, he purchased ounce quantities of cocaine from Thompson.

Further, from Morley's testimony, the jury learned that Morley provided bail for Thompson's release after his arrest on January 7, 2012, after he was asked to do so by one of Thompson's associates. That individual also advised Morley that, after Thompson's arrest, they moved the car Thompson had borrowed from Morley and parked it on Morley's street and had cleaned out Thompson's apartment and removed contraband, including a firearm. In a recorded telephone conversation after he was released, Thompson told Morley that he "appreciate[d] everything."

There was also substantial evidence of the quantities of cocaine, marijuana and oxycodone to support the jury's attribution of 5 kilograms or more of cocaine, 280 grams or more of cocaine base and an indeterminate quantity of oxycodone to Thompson based on his own actions and his reasonable foreseeability regarding the distribution activities of the entire

conspiracy.  In particular, Morley testified that he supplied Thompson with 2 kilograms of

cocaine from which Thompson converted approximately 1 kilogram to cocaine base.  And at the

time of Thompson's arrest on January 7, 2012, law enforcement officers recovered 18 bags of

cocaine base and $1,076 in U.S. currency.  Other evidence regarding the quantity of cocaine that

Thompson could reasonably foresee would be distributed by the conspiracy could be inferred

from his intercepted phone conversations with Morley in which they discussed the scope of the

conspiracy's cocaine distribution activities.  With regard to oxycodone, Morley testified that he

provided Thompson approximately 400 oxycodone pills, each of which contained 30-milligrams

of the narcotic.  Again, Morley's testimony is supported by audio recordings of conversations

between Martin and Thompson on that subject.  In sum, there was ample direct and substantial

evidence of Thompson's drug-trafficking as well as his knowledge of the extent and scope of the

drug-trafficking activities of the overall conspiracy to support the jury's quantity attributions of

narcotics to Thompson.

_Discussion_

As noted, Vaughn argues that there was insufficient evidence to support the jury's finding

of guilt beyond a reasonable doubt, specifically because Morley's testimony was wholly

unreliable and incredible both with regard to Vaughn's membership and participation in the

charged conspiracy and the drug quantities attributed to him.  Thompson also asserts that

Morley's testimony, in general and with regard to drug quantities, was so lacking in credibility

that it should not have been submitted to the jury, particularly in light of Morley's "incredible

criminal history and his admission that he would do whatever suit[ed] him."  Besides attacking

Morley's credibility, the defendants do not otherwise contest the sufficiency of his testimony.

10

The Court not only finds the defendants' bald, unsupported claims about Morley's credibility to be totally without merit, it also finds their claims as to the sufficiency of the evidence to be without factual and legal support.  To the contrary, the totality of the evidence, viewed in the light most favorable to the government, was more than sufficient to permit a reasonable juror to conclude beyond a reasonable doubt the existence of the narcotics conspiracy charged in the second superseding indictment, both Vaughn's and Thompson's membership in it and the quantities of drugs attributed to the conspiracy in general and to each defendant individually.

Morley's testimony was consistent with, and corroborated by, direct video, audio and physical evidence of Vaughn's and Thompson's participation in the conspiracy's drug-trafficking activities.  That, without more is sufficient to support a reasonable jury's inference that Vaughn and Thompson were knowing and active co-conspirators.  United States v. Florez, 447 F.3d 145, 155 (2d Cir. 2006) (quoting United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990)) (noting that the testimony of an accomplice and co-conspirator, as long as it is not incredible on its face and does not defy physical realities, is more than sufficient to prove a defendant's knowing participation and membership in a conspiracy beyond a reasonable doubt).  Because Morley's testimony was not patently incredible as a matter of law and his testimony did not defy physical realities, his credibility was exclusively a matter for the jury to determine.  United States v. Forrester, 60 F.3d 52, 63 (2d Cir. 1995).  In the absence of such extraordinary circumstances, the Court may not intrude on the jury's assessment of his credibility.  United States v. Burden, 600 F.3d 204, 226 (2d Cir. 2010); Florez, 447 F.3d at 156.

Moreover, the credibility of Morley's testimony is also supported by the absence of any

evidence that contradicted it.  Morley did not contradict himself and neither did any other witness or piece of evidence.  But even if Morley's testimony had been contradicted, the nature and extent of Vaughn's and Thompson's  participation in the conspiracy did not solely rest on his testimony. The audio recordings of Vaughn's and Thompson's intercepted phone conversations were inculpatory standing alone.  Indeed, the defendants implicated themselves when they conversed with their co-conspirators about their drug-trafficking activities and their interactions with other members of the conspiracy.  Their recorded conversations evidenced their extensive activities in furtherance of the conspiracy's objectives and their positions of trust in the conspiracy.

Further, Morley's testimony was subjected to rigorous cross-examination by counsel for both Vaughn and Thompson and their examinations were not limited in scope or duration.  Both counsel delved deeply into matters affecting Morley's credibility and they were able to elicit from him  testimony showing his bad character and motives to testify falsely, as well as his criminal history, his leadership role in the conspiracy, his extensive drug trafficking activities and how, pursuant to his plea and cooperation agreements with the government, he stood to receive leniency and favorable treatment in exchange for his testimony.  Such impeaching evidence gave the jury a fair opportunity to consider Morley's motives for testifying falsely in favor of the government and to evaluate the truthfulness of his testimony.  The jury was advised by the Court that it was the sole judge of Morley's credibility and was given guidance as to how it should evaluate his testimony in light of the impeachment evidence elicited on cross-examination.  In that regard, the Court instructed the jury that it should consider whether his testimony was biased or slanted in the government's favor considering the benefits he could  receive in exchange for his testimony, including leniency in sentencing and other favorable treatment.  The Court also

12

instructed the jurors that they should carefully and cautiously scrutinize Morley's testimony and give it whatever weight they believed it deserved.  The Court's instructions regarding the impeachment evidence and specifically how it could impact their assessment of Morley's credibility, enabled the jury to weigh and decide if Morley's testimony was believable.

In sum, given the totality of the credible and corroborated direct and circumstantial evidence, including Morley's testimony, of the existence of the drug conspiracy and evidence showing that Vaughn and Thompson knew the conspiracy involved possession and distribution of illegal drugs and knowingly participated in it with the specific intent to further its drug-trafficking goals, it was well within the province of the jury to find beyond a reasonable doubt that both Vaughn and Thompson were guilty as charged in count one of the second superseding indictment.  To the extent that the jury's verdicts were based on its assessment of Morley's credibility, the defendants have not pointed to anything to permit the Court to second guess its determination that Morley's testimony was credible.  United States v. Scarpa, 913 F.2d 993, 1018 (2d Cir. 1990) (citing United States v. Singh, 628 F.2d 758, 763 (2d Cir.1980)); see also United States v, Truman, 688 F.3d 129, 140 (2d Cir. 2012) (holding that cooperator's status and history of drug use did not render his testimony incredible as a matter of law).

For the same reasons, the defendants' motion for a new trial is also without merit.  The Court has no concern that innocent men were convicted or that there is any manifest injustice in allowing the defendants' guilty verdicts to stand.  Further, the Court has considered the claims raised in the defendants' pro se motion for a new trial and finds it to be without merit.

With regard to the claim based on Alleyne v. United States, 133 S. Ct. 2151 (2013), the Court notes that the second superseding indictment charged specific drug types and quantities

and that the jury made specific drug quantity findings on the verdict forms.  Thus, there was no Alleyne violation.  Further, there was no error in aggregating drug quantities to reach the thresholds to trigger the applicable statutory penalties.  United States v. Pressley, 469 F.3d 63, 66 (2d Cir. 2006).  Third, the challenge to the indictment's asserted multiplicity is procedurally barred.  Claims of defects in an indictment must be made prior to trial.  E.g., United States v. Sinnott, 523 Fed. App'x 807, 809 (2d Cir. 2013) (summary order); Fed. R. Crim. P. 12(b)(3)(B).  Fourth, any purported violation of double jeopardy, the "rule of lenity" or "mens rea" are deemed abandoned for the failure to brief or argue them.  E.g., Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998).  Fifth, the bald allegation of prosecutorial vindictiveness is without any actual evidence or proof that the government's charging decision was "a direct and unjustifiable penalty" that resulted solely from the defendants' exercise of a protected legal right.  E.g., United States v. Sanders, 211 F.3d 711, 716-17 (2d Cir. 2000).  Sixth, the claim of late disclosure of Morley's prior statements is baseless.  The government fully complied with its obligations under the Jencks Act by disclosing Morley's prior statements to the defendants two weeks prior to the start of evidence..  See 18 U.S.C. § 3500; Fed. R. Crim P. 62.  Finally, the Court finds no prejudice in either its jury instructions or verdict forms.

## *CONCLUSION*

For the foregoing reasons, the defendants' Rule 29 motions for judgments of acquittal and Rule 33 motions for new trial [docs. ## 982, 1005] are DENIED.

SO ORDERED.

/s/_____
ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated this 25th day of April, 2014 at New Haven, Connecticut.